DA 20-0031

FILED

04/13/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0031

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 85

ESTATE OF NICHOLAS TYSON FRAZIER; and
JEANETTE YOUNG; by and through Personal
Representative Brittney King f/k/a/ Brittney Chatriand;

      Plaintiffs and Appellants,

  v.

ERIK MILLER and JOHN DOES 1-10,

      Defendant, Appellee, and Cross-Appellant.

APPEAL FROM:    District Court of the Third Judicial District,
In and For the County of Powell, Cause No. DV-17-97
Honorable Ray J. Dayton, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

            Nathan G. Wagner, Jenna P. Lyons, Sullivan, Wagner & Lyons, PLLC,
Missoula, Montana

      For Appellee:

            Cynthia L. Walker, Patrick M. Sullivan, Poore, Roth & Robinson, P.C.,
Butte, Montana

                        Submitted on Briefs:  February 17, 2021

                                  Decided:  April 13, 2021

Filed:

_____
                            Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Appellants the Estate of Nicholas Tyson Frazier, through its personal representative Brittney King f/k/a Brittany Chatriand, and Jeanette Young (collectively the "Estate"), appeal the judgment on a jury verdict finding that Appellee and Cross-Appellant Erik Miller was justified when he used deadly force against Frazier. The Estate challenges the Third Judicial District Court's ruling on the Estate's constitutional tort claims, the Special Verdict Form directing the jury to consider justifiable use of force before determining Officer Miller's negligence, and the District Court's failure to allow counsel to make a record of their objections during trial. We affirm on all issues and therefore decline to consider Miller's cross-appeal that he was entitled to statutory immunity under § 2-9-305, MCA. We restate the issues as follows:

*1. Did the District Court err in precluding jury consideration of the Estate's constitutional tort claim?*

*2. Did the Special Verdict Form fail to clearly and fairly present the jury with the ultimate questions of fact?*

*3. Did the District Court abuse its discretion by failing to record all sidebar discussions of evidentiary objections?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 On the evening of December 19, 2014, Nicholas Frazier called the Deer Lodge Police Department reporting that he was assaulted that night at a Christmas party. Deer Lodge Police Officers Erik Miller and Gavin Roselles responded to the call. The officers arrived at Frazier's residence—his parents' home—to find Frazier heavily intoxicated, crying, and overall in a highly emotional state. Frazier reported that

2

Lonnie Morgan, a partygoer at the nearby Christmas party, assaulted him and that he wanted to press charges. Officers Miller and Roselles gave Frazier an incident report form to fill out, watched him enter his house, and then went to the location of the Christmas party to continue their investigation.

¶3 The officers interviewed several witnesses at the Christmas party, including Frazier's mother and stepfather, Jeanette and Robert Young. The Youngs had not invited Frazier to join them at the party because they wanted a "stress-free" time there. Frazier nonetheless soon arrived and began drinking heavily, becoming argumentative, and making other guests uncomfortable. The party hosts and the Youngs eventually decided Frazier should be taken back home. When Frazier refused to leave, a host and several others escorted him out, placed him in a car, and drove him to the Youngs' residence. Lonnie Morgan was one of the people in the car with Frazier; due to Frazier's anger at being forced to leave, Morgan apparently physically restrained Frazier in the back seat, leading to Frazier's assault claim. Officers Miller and Roselles concluded their investigation at the party and returned to the police station.

¶4 Soon after they arrived, dispatch received a call from a male at the Youngs' residence—Frazier—asking dispatch to call a funeral home because there will be a suicide, and it will occur before any first responders will have time to respond. Miller and Roselles were sent to respond to the call. Although dispatch informed the officers only that they were responding to a suicidal male at the same residence as the assault call, Miller and Roselles presumed Frazier placed the call because of their earlier interaction with him and because Miller knew Frazier had a history of suicide attempts.

3

¶5     Miller and Roselles arrived at the house with their patrol car's lights off.  In order to ensure their own safety and preliminarily assess the situation, the officers each patrolled around one side of the house.  Because all the shades were drawn, however, the officers were not able to gather any additional information.  Officer Roselles finished checking his section of the perimeter first.  He stepped onto the front porch and knocked on the door several times, to no response.  At about this time, Officer Miller joined Officer Roselles on the porch by the front door.  Officer Roselles then turned the doorknob and opened the front door a few inches.  At this point, Frazier responded, yelling at the officers that they did not have the right to be there, to close the door, and to get out of the house and go away.  Frazier also stated that he was "fine."  Neither officer could see Frazier at this point—only hear him.  Officer Roselles backed off the front porch and called dispatch, attempting to obtain additional information that might justify a warrantless entry or the phone number for Frazier's parents, so that he might obtain consent to enter the house.  Dispatch could not provide him with either.

¶6     By the time Officer Roselles finished his call, Officer Miller had pushed the front door fully open; in doing so, his hand reached inside Frazier's home.  At the time he pushed the door open, Miller still could not see Frazier.  At this point, Officer Roselles turned on his body-camera and took a position slightly behind Officer Miller by the front door.  Frazier then quickly stepped in front of the doorway, holding a pistol to his own head; in response, Officer Miller immediately drew and presented his service pistol.  Still holding his pistol to his head, Frazier repeatedly begged the officers to shoot him.  Officer Miller attempted to de-escalate the situation and told Frazier to put his gun down, but Frazier

4

ignored his requests and continued to ask the officers to shoot him. While Officer Miller was still attempting to calm the situation, Frazier moved his gun's barrel away from his head and toward Officer Miller stating, "Suicide by cop, I know all about it." Officer Miller then fired three rounds from his pistol, all striking Frazier, who collapsed to the floor. The officers attempted first aid, to no avail.

¶7 In 2017 the Estate filed its complaint in this matter, alleging assault, wrongful death, negligence by Officer Miller, and violation of Frazier's rights under the Montana Constitution. The constitutional tort claim argued that by opening Frazier's front door and breaching the threshold of the residence, Officer Miller conducted an unconstitutional search and seizure and unconstitutionally invaded Frazier's privacy. The Estate also named the City of Deer Lodge ("City") and Michael Gray, then Chief of the Deer Lodge Police Department, as defendants vicariously liable for Officer Miller's actions.

¶8 Officer Miller filed a motion for summary judgment, seeking dismissal of all claims against him. The motion argued in part that he was statutorily immune under § 2-9-305, MCA. The Estate responded by voluntarily dismissing the City and Gray, leaving Officer Miller as the only named defendant. The District Court rejected Officer Miller's immunity argument but granted him summary judgment on the Estate's constitutional claim. It held that there was no actionable violation of Frazier's right of privacy and no unlawful search or seizure because "no reasonable person, juror or otherwise, could reasonably expect that there would not be law enforcement entry without a warrant, under the circumstances created by [Frazier]. There was no reasonable

5

expectation of privacy. There was no search or seizure as contemplated by the Montana Constitution."

¶9 The case went before a Powell County jury in December 2019. Officer Miller asserted justified use of force as his primary defense; the Estate countered by arguing that the officers had no legal right to enter the house after Frazier told them that he was fine and to leave. At the conclusion of trial, the District Court presented the jury with a Special Verdict Form. It directed the jurors first to consider whether Officer Miller's use of force was justified. If they found the use of force justified, they were to end deliberations. If not, they were instructed to consider whether Officer Miller was negligent. The jury found Officer Miller's use of force justified, and the District Court entered judgment in his favor.

## STANDARDS OF REVIEW

¶10 We review de novo a district court's order granting summary judgment. *Dorwart v. Caraway*, 2002 MT 240, ¶ 28, 312 Mont. 1, 58 P.3d 128 (citing *Clark v. Eagle Sys.*, 279 Mont. 279, 283, 927 P.2d 995, 997 (1996)). A party seeking summary judgment must establish the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Dorwart*, ¶ 28 (citing M. R. Civ. P. 56(c); *Clark*, 279 Mont. at 283, 927 P.2d at 997-98). "Conclusory statements, speculative assertions, and mere denials are insufficient to defeat a motion for summary judgment." *Moe v. Butte-Silver Bow County*, 2016 MT 103, ¶ 14, 383 Mont. 297, 371 P.3d 415 (citing *Davis v. State*, 2015 MT 264, ¶ 7, 381 Mont. 59, 357 P.3d 320). We review a district court's conclusions of law for correctness and its findings of fact for clear error. *Moe*, ¶ 14 (citing *Pilgeram v. GreenPoint Mortg. Funding, Inc.*, 2013 MT 354, ¶ 9, 373 Mont. 1, 313 P.3d

839). "The availability of a cause of action presents a question of law that we review to determine if it is correct." *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, ¶ 60, 338 Mont. 259, 165 P.3d 1079 (citing *Dorwart*, ¶ 29).

¶11 It is within a district court's discretion to use a special verdict form, which we review for abuse of discretion. M. R. Civ. P. 49(a); *Kiely Constr. L.L.C. v. City of Red Lodge*, 2002 MT 241, ¶ 57, 312 Mont. 52, 57 P.3d 836 (citing *Barthule v. Karman*, 268 Mont. 477, 488, 886 P.2d 971, 978 (1994)). A trial court abuses its discretion when it acts arbitrarily or unreasonably, resulting in a substantial injustice. *State v. Price*, 2008 MT 319, ¶ 13, 346 Mont. 106, 193 P.3d 921 (citing *State v. Sanchez*, 2008 MT 27, ¶ 15, 341 Mont. 240, 177 P.3d 444).

¶12 Finally, district courts have "broad discretion" in matters of trial administration; we review their decisions regarding trial administration for abuse of discretion. *Jarvenpaa v. Glacier Elec. Coop.*, 1998 MT 306, ¶ 12, 292 Mont. 118, 970 P.2d 84.

**DISCUSSION**

¶13 *1. Did the District Court err in precluding jury consideration of the Estate's constitutional tort claim?*

¶14 The Montana Constitution guarantees an individual right to privacy that shall not be infringed absent "the showing of a compelling state interest." Mont. Const. art II, § 10. Even if a compelling state interest is demonstrated, "state action which infringes upon an individual's privacy right must be closely tailored to effectuate that compelling interest." *State v. Goetz*, 2008 MT 296, ¶ 39, 345 Mont. 421, 191 P.3d 489. Montana's Constitution further provides that "[t]he people shall be secure in their persons, papers, homes and

7

effects from unreasonable searches and seizures"; warrantless searches accordingly are presumed to be unreasonable absent a delineated exception. Mont. Const. art II, § 11; *State v. Bullock*, 272 Mont. 361, 374, 901 P.2d 61, 70 (1995) (citation omitted). This Court explicitly recognized a civil cause of action to remedy a violation of these rights in *Dorwart*, ¶ 48.

¶15 The Estate argues that the District Court erred when it ruled as a matter of law that Officer Miller did not violate Frazier's rights and then refused to instruct the jury on the constitutional torts recognized in *Dorwart*. Though only Officer Miller's hand entered Frazier's house when he pushed the front door open, the Estate maintains that this action unconstitutionally invaded Frazier's privacy and constituted a prohibited search and seizure—violating both Sections 10 and 11, Article II, of the Montana Constitution. Officer Miller argues that no constitutional violation occurred because at the time of the incident he and Officer Roselles were fulfilling their community caretaker obligations, which under the circumstances permitted the limited intrusion. The Estate counters that the community caretaker doctrine does not apply here because Frazier told the officers to leave and said he was "fine."

¶16 The community caretaker doctrine is a recognition that law enforcement's duties extend to not just fighting crime, but also to assisting members of the public and investigating situations that could result in public safety hazards. *See State v. Smith*, 2004 MT 234, ¶ 14, 322 Mont. 466, 97 P.3d 567; *State v. Nelson*, 2004 MT 13, ¶ 6, 319 Mont. 250, 84 P.3d 25. "The community caretaker doctrine is operative where law enforcement initiates contact with a citizen, not to investigate the commission of a crime,

8

but to investigate a potential vehicle accident or otherwise to ensure the safety of citizens." *State v. Spaulding*, 2011 MT 204, ¶ 18, 361 Mont. 445, 259 P.3d 793. We first recognized the doctrine in *State v. Lovegren*, 2002 MT 153, 310 Mont. 358, 51 P.3d 471, a case in which an officer stopped to check on the welfare of a motorist after noticing his car parked off the side of the road. We identified three categories of "police-citizen encounters."

> The first category of police-citizen encounters involves the arrest of a citizen which must be supported by probable cause[;] otherwise the Fourth Amendment prohibition against unreasonable seizures is violated. *Henry v. United States* (1959), 361 U.S. 98, 80 S. Ct. 168, 4 L. Ed. 2d 134.
>
> The next category involves the "Terry" stop, a brief seizure of the individual that must be supported by a reasonable suspicion of criminal activity to be within acceptable Fourth Amendment boundaries. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889, 44 Ohio Op. 2d 383.
>
> The final and least intrusive category does not involve any form of detention at all and, therefore, does not involve a seizure. This category is generally referred to as the "community caretaker" or public safety function.

*Lovegren*, ¶¶ 14–16. We recognized in *Spaulding*, ¶ 18, that even "a welfare check by its very nature necessarily involves a brief seizure—but a seizure nonetheless—in order for the officer to ascertain whether the citizen needs assistance or is in peril." But:

> The criteria of the community caretaker doctrine . . ., as well as its underlying rationale—namely, that a peace officer has a duty promptly to investigate situations in which a citizen may be in peril or need some type of assistance from an officer . . .—render the seizure constitutionally "reasonable,["] notwithstanding the absence of a warrant. *Spaulding*, ¶ 18 (citing *Lovegren*, ¶ 20).

¶17 For the doctrine to apply, the reasons for law enforcement's contact or investigation must be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *State v. Grmoljez*, 2019 MT 82, ¶ 9,

9

395 Mont. 279, 438 P.3d 802 (quoting *Lovegren*, ¶ 17). We articulated in *Lovegren* three factors to determine if the community caretaker exception applies:

> First, as long as there are objective, specific, and articulable facts from which an experienced officer would suspect that a citizen is in need of help, that officer has the right to stop and investigate. Second, if the citizen is in need of aid, the officer may take appropriate action to render assistance or mitigate the peril. Third, once the officer is assured that the citizen is no longer in peril, or that the peril has been mitigated, any action beyond that constitutes a seizure implicating the Fourth Amendment and Article II, Section 11 of the Montana Constitution.

*Grmoljez*, ¶ 9 (quoting *Lovegren*, ¶ 25). "[E]ach community caretaker case turns on its discreet facts." *Grmoljez*, ¶ 11 (quoting *Spaulding*, ¶ 25).

¶18 The community caretaker doctrine typically is invoked in the assertion of an unlawful search to forbid the introduction of evidence discovered during a law enforcement officer's interaction with the defendant. *See Nelson*, ¶ 6 ("This Court has recently expounded Montana's version of the community caretaker doctrine in situations where a police officer's investigation of a public safety concern morphs into a seizure or an arrest because of an escalation of events which develop after the initial inquiry"); *Spaulding*, ¶ 18 ("the *Terry* stop and the community caretaker stop are simply different branches of the same principle—both are constitutionally 'reasonable' warrantless seizures because both are grounded in the officer's necessarily swift action or reaction to an on-the-spot situation, limited in scope to the purpose for which the stop is made"); *Grmoljez*, ¶ 9 ("[the] three-part test [ensures that] application of the community caretaker doctrine comports with constitutional protections and is not used merely as a pretext for illegal searches and seizures"). We made clear in *Lovegren*, ¶ 25 that:

10

Once . . . the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure implicating not only the protections provided by the Fourth Amendment, but more importantly, those greater guarantees afforded under Article II, Sections 10 and 11 of the Montana Constitution as interpreted in this Court's decisions.

¶19 "'When analyzing search and seizure questions that specially implicate the right of privacy under Montana's Constitution,' Sections 10 and 11 are read together." *Smith*, ¶ 9 (quoting *State v. Boyer*, 2002 MT 33, ¶ 19, 308 Mont. 276, 42 P.3d 771). We have defined a "search" as "the use of some means of gathering evidence which infringes upon a person's reasonable expectation of privacy." *State v. Elison*, 2000 MT 288, ¶ 48, 302 Mont. 228, 14 P.3d 456. But "where no reasonable expectation of privacy exists, there is neither a 'search' nor a 'seizure' within the contemplation of Article II, Sections 10 and 11 of the Montana Constitution." *Smith*, ¶ 9. Here, Officers Miller and Roselles did not approach Frazier on their own initiative; the State never charged or attempted to charge Frazier with any criminal offense; and there is no issue in this case arising from the discovery of evidence during the alleged intrusion. Thus, to the extent we analyze the community caretaker doctrine's three-factor inquiry to determine suppression of evidence of a crime, the inquiry is not directly apposite. But we still must answer the question whether Officers Miller and Roselles were operating in their *role* of community caretakers during the incident in question—a routine function of law enforcement officers that does not involve investigation of criminal activity or, under the facts here, any form of detention "and, therefore, does not involve a seizure." *Lovegren*, ¶ 16. Our previous analyses

11

regarding the permissible actions of law enforcement when functioning as community

caretakers therefore remain instructive. [1]

¶20    Officers Miller and Roselles responded to two 911 calls Frazier made to police.  In

the first, Frazier reported an assault against him.  Through their interactions with Frazier

during this encounter, the officers learned not only of Frazier's intoxicated, excitable, and

despondent state that night, but also that his parents were at a party and he was alone in the

house.  In the second call, Frazier reported an imminent suicide at his residence and told

dispatch to call a funeral home.  When they responded to this call, Officers Miller and

Roselles attempted to assist a citizen in peril—a community caretaker function.

*Grmoljez*, ¶ 9.  The officers approached Frazier's house quietly and first tried to gather

---

[1] The community caretaker role of law enforcement, as originally expounded by the United States Supreme Court and referenced by this Court in *Lovegren*, focused on day-to-day public encounters between citizens and law enforcement.  *See, e.g., Terry*, 392 U.S. at 13–14, 88 S. Ct. at 1875–76 (noting how *street* encounters between citizens and police officers are initiated by police "for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute for crime"); *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528 (1973) (specifically mentioning how police-citizen contact involving automobiles is "substantially greater than police-citizen contact in a home or office" due to the frequency with which automobiles break down or are involved in accidents, and that police investigation in such situations is frequently "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute" and is best described as a "community caretaking function[]").  As we recognized in *Lovegren*, these interactions are the "least intrusive" category of law enforcement interaction with citizens.  *Lovegren*, ¶ 16.

Though many community caretaker welfare checks may "involve[] a brief seizure, *Spaulding,* ¶ 18, the situation here was not such an encounter.  Instead of approaching a potentially broken-down automobile or a citizen experiencing a medical emergency in a public space, Officers Miller and Roselles found themselves in what has become law enforcement's commonplace default role as the "on-call" first responders to a mental health crisis.  Whether that is an appropriate function for a law enforcement officer is a fraught public policy issue neither within the prerogative of the Court to adjudicate nor necessary to resolution of this appeal.  The Estate does not dispute that the officers exercised a community caretaker function when they responded to Frazier's 911 call; the only issue is whether Officer Miller exceeded the permissible scope of that function and conducted an unconstitutional seizure when he pushed open the door.

12

information on the situation by looking around the house. When this proved futile, Officer Roselles knocked on the door and announced his presence, to no response. Given the lack of response and imminent nature of the call—Frazier stated he would be dead before anyone arrived—Officer Roselles was justified in attempting to open the front door. The officers limited their intrusion to the minimum necessary to safely determine if Frazier was still in peril.

¶21    Once Officer Roselles cracked the door, Frazier, still out of sight, told the officers to leave and that he was "fine." Citing the first factor of the community caretaker inquiry, the Estate argues that at this point the officers "were operating under objective, specific and articulable facts that Frazier did not need help" and had completed their community caretaking function. Unlike the majority of community caretaker cases addressed by this Court, however, the officers did not initiate contact with Frazier because of their direct observations but responded to Frazier's own call to dispatch and dispatch directing the officers to the residence. *See, e.g., Grmoljez*, ¶¶ 3–5; *State v. Marcial*, 2013 MT 242, ¶¶ 4–6, 371 Mont. 348, 308 P.3d 69; *State v. Seaman*, 2005 MT 307, ¶¶ 3–7, 329 Mont. 429, 124 P.3d 1137; *Lovegren*, ¶¶ 3–4. The officers knew Frazier was intoxicated, distraught, and had a history of suicide attempts, and they could not confirm his safety—they could not see whether Frazier was injured, overdosing, or in need of assistance from an unsuccessful or unfinished suicide attempt. As we have recognized, "[a]n officer has a duty to respond to a 911 call for help . . . the community caretaker role is an 'affirmative duty of peace officers.'" *City of Missoula v. Metz*, 2019 MT 264, ¶ 16, 397 Mont. 467, 451 P.3d 530. Given the nature of Frazier's 911 call, their interactions with Frazier earlier

13

that night, and their impressions regarding Frazier's state of mind, the officers had a continuing duty to ensure Frazier was not in some sort of peril; their caretaking role had not ended. It would not have been reasonable under these circumstances for the officers simply to leave him alone.

¶22 When Officer Roselles unsuccessfully attempted to gather more information or to obtain an alternative means of consent to enter the house, Officer Miller approached the front door and pushed it further open, resulting in his hand entering Frazier's residence. The Estate analogizes this action to our decision in *Smith*, where we found an officer's intrusion into a closed private bathroom was not justified. *See Smith*, ¶¶ 14–17. In *Smith*, officers were dispatched to an apartment following a noise complaint. *Smith*, ¶ 3. They discovered a party and were allowed in by a guest. *Smith*, ¶ 3. Inside the apartment, an officer heard vomiting coming from behind a bathroom door; without first knocking, he opened the door and found Smith "on the floor, hugging the toilet, with her head in the toilet bowl," and smelled the odor of alcohol. *Smith*, ¶ 4. Smith, eighteen at the time, was charged with possession of alcohol by a minor. *Smith*, ¶ 4. On appeal, this Court reversed the District Court's denial of Smith's motion to suppress evidence the officer obtained by opening the door. We noted that police arrived at the apartment in response to a noise disturbance complaint; perceived no threats of danger; and, although the officer heard vomiting coming from the bathroom, he could have inquired about the situation by asking other partygoers about it or by knocking on the bathroom door. *Smith*, ¶ 15. We concluded that the community caretaker doctrine "did not justify entry into the bathroom and

14

impingement of the defendant's privacy interests under circumstances which provided alternate means of immediately determining her well-being." *Smith*, ¶ 16.

¶23 In contrast to *Smith*, the officers here were responding to a threat of imminent suicide, a non-criminal but imminently perilous situation in which immediate action is often necessary. Unlike in *Smith*, the person needing assistance initiated contact with law enforcement. Frazier said little to the officers, and Officer Roselles testified that despite Frazier's assertion to the contrary, Frazier did not sound "fine" and remained hidden from view. Officer Roselles testified that due to the nature of situations involving a suicidal individual, the officers had an ongoing duty to initiate contact and to either verify that the person is not in danger or attempt to get him help.

¶24 In further contrast to the officers in *Smith*, Officer Roselles called dispatch attempting to obtain more information or consent to enter the house. Only when this failed did Officer Miller push the front door further open. Officer Miller limited his action to the scope of their visit—assessing whether Frazier required further assistance—and did not enter the house more than necessary to push the door open. Unlike the situation in *Smith*, there was no other way of immediately verifying Frazier's well-being. *See Spaulding*, ¶ 18. Once the door was fully open, Frazier did not attempt to close it or continue to request the police to leave. Rather, he appeared in the door with a gun to his head—confirming the officers' suspicion that he was not, in fact, "fine"—and continued to engage with the officers. Though Frazier's next actions escalated the situation, Officer Miller's response

to that point was justified under his community caretaker role.[2] Officer Miller did not threaten Frazier with arrest or with any other punitive act but, in a calm and measured voice, pleaded with Frazier that suicide is "a permanent solution to a temporary problem" and implored Frazier to put his gun away so that he could holster his own weapon. Officers Miller and Roselle's actions in their response to a call Frazier placed did not constitute either a search or a seizure; this situation squarely falls under the "least intrusive category" of law enforcement's interaction with the public. *Lovegren*, ¶ 16.

¶25 To determine if the government has unlawfully intruded into one's privacy in situations potentially involving a search and seizure, we look to "(1) whether [the person has] an actual expectation of privacy . . .; (2) whether society is willing to recognize that expectation as objectively reasonable; and (3) the nature of the [S]tate's intrusion." *Smith*, ¶ 10 (citing *Boyer*, ¶ 20). "[I]t is beyond dispute that a person has an expectation of privacy in his or her home—indeed it is in one's home where one has the greatest expectation of privacy." *State v. Bassett*, 1999 MT 109, ¶ 37, 294 Mont. 327, 982 P.2d 410. But Frazier's second 911 call demonstrates that he did not have an actual expectation of privacy at his residence. First, he initiated the call and summoned a response to his residence. Second, his statements to dispatch that law enforcement would not be able to get there before the suicide evidence an expectation that law enforcement would attempt

---

[2] On appeal, the Estate's arguments surrounding constitutional violations focus solely on issues relating to Officer Miller breaching the threshold of the residence when he pushed the front door open. The Estate does not argue that, should the Court conclude Officer Miller was constitutionally justified in opening the door, his subsequent use of force constituted a constitutional violation on its own.

to respond to his call. Third, as explained above, it would have been "a dereliction of [duty]" had the officers ignored Frazier's call or simply walked away when he called out that he was "fine." *Lovegren*, ¶ 26. And finally, the nature of the intrusion was slight; the officers approached only as far as needed to determine Frazier's condition and to attempt to communicate with him.

¶26 We have emphasized that a primary concern in community caretaker cases is ensuring the community caretaker role is not used "as a pretext for illegal search and seizure[;] the stop must actually involve a 'welfare' check." *Grmoljez*, ¶ 12 (quoting *Marcial*, ¶ 13). Given the undisputed record facts, we are assured that the officers here were engaged in a constitutionally permissible welfare check, "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Grmoljez*, ¶ 9. Frazier's rights to privacy under Article II, Section 10, and to be free from unreasonable searches and seizures under Article II, Section 11, of the Montana Constitution were not violated. The District Court did not err in ruling in favor of Officer Miller as a matter of law on the Estate's constitutional tort claims and in refusing to instruct the jury on a constitutional tort theory of liability.

¶27 The District Court's decision also comports with our decisions in *Dorwart*, *Sunburst*, and *Bassett v. Lamantia*, 2018 MT 119, 391 Mont. 309, 417 P.3d 299. In *Dorwart* this Court established the availability of a direct civil cause of action for violations of the rights guaranteed by Article II, Sections 10, 11, and 17, of the Montana Constitution. *Dorwart*, ¶ 48. In *Sunburst*, the district court instructed the jury on a constitutional tort theory regarding alleged violation of the right to a clean and healthful environment found

17

in Article II, Section 3, of the Montana Constitution. *Sunburst*, ¶¶ 60–64. On appeal, we clarified that *Dorwart* established a constitutional tort based on the absence of any other adequate remedy at law. *Sunburst*, ¶ 64. In contrast, we determined that if the plaintiffs could vindicate their rights through an alternate remedy a constitutional remedy need not be employed. *Sunburst*, ¶ 64.

¶28 Here, the Estate sought to vindicate Frazier's constitutional rights to privacy, freedom from unreasonable searches and seizures, and due process. Although the District Court did not submit the constitutional tort claim to the jury, it allowed the Estate to present its constitutional arguments in the context of its negligence claim against Officer Miller. The theory of the Estate's case revolved in no small part around its contention that Officer Miller was not lawfully—*i.e.*, was unconstitutionally—in the doorway when he used force against Frazier, and he therefore had a duty to retreat before using deadly force. The District Court instructed the jury on the duty of care an officer owes to a person injured directly by the officer's affirmative actions. In such cases, "the officer owes the plaintiff a legal duty to exercise the same care that a reasonable officer with similar skill, training, and experience would under the same or similar circumstances." *Bassett*, ¶ 19. Because an officer's skill and training are grounded in the constitutional parameters of law enforcement authority, the court instructed the jury on the laws and exceptions regarding warrantless entry into a residence, such as plain view and exigent circumstances, and on the community caretaker doctrine. The Estate was entitled to recover if the jury found that Officer Miller breached his duty of care under these principles. The negligence claim thus essentially encompassed the same standards a jury

18

would use in consideration of the Estate's proffered constitutional tort claim. Accordingly, here the Estate's common law negligence claim provided an adequate remedy for any damages caused by Officer Miller's alleged unconstitutional acts. *See Sunburst*, ¶ 64. The District Court did not err by refusing to submit the separate constitutional tort theory to the jury.

¶29 *2. Did the Special Verdict Form fail to clearly and fairly present the jury with the ultimate questions of fact?*

¶30 Following extensive discussion with counsel about the form of the special verdict, the District Court submitted a Special Verdict Form that directed the jury to first consider whether Officer Miller's use of force was justified. If the jury answered "yes" to that question, its deliberations were finished. If it answered "no," the Special Verdict Form instructed it to consider Officer Miller's negligence.

¶31 The Estate argues that because the Special Verdict Form instructed the jury to make a finding on Officer Miller's justified use of force before taking up the question of negligence, the Estate was forced to prevail on two questions just to reach the single issue whether Officer Miller was negligent. According to the Estate, this is neither a fair nor clear submission of the ultimate question of fact and therefore the District Court abused its discretion. Officer Miller responds that the Estate has not identified any issue of fact raised by the pleadings or evidence that was not submitted to the jury, the jury instructions properly instructed the jury on the issue of negligence, and the Special Verdict Form specifically addressed the issue of negligence.

¶32 Special verdict forms are permitted under M. R. Civ. P. 49(a). In reviewing the adequacy of a special verdict form, we consider "1) whether, when read as a whole and in conjunction with the general charge, the interrogatories adequately presented the contested issues to the jury; 2) whether the submission of the issues to the jury was fair; and 3) whether the ultimate questions of fact were clearly submitted to the jury." *Baldauf v. Arrow Tank & Eng'g Co.*, 1999 MT 81, ¶ 49, 294 Mont. 107, 979 P.2d 166.

¶33 Here, the general charge at issue is negligence on the part of Officer Miller; Officer Miller relied on the defense of justifiable use of force. Question One on the Special Verdict Form asked the jury if it finds Officer Miller's use of force justified, and Question Two asked if it finds Officer Miller negligent. Jury Instruction No. 19 stated that Officer Miller had a duty to conduct himself as a reasonable police officer would under the circumstances; Instruction No. 20 stated a police officer justifiably using force is immune from civil damages; and Instructions Nos. 21–22 stated the law regarding justifiable use of force and the associated reasonableness standard. The Estate does not claim that these jury instructions misstated the applicable laws.

¶34 In the Amended Final Pre-Trial Order, the Estate identified as issues of fact to be litigated at trial whether Officer Miller's use of force was justified and whether or not he was negligent; it was fair for the District Court to submit these identified issues to the jury. *Baldauf*, ¶ 49. These ultimate questions of fact were submitted to the jury in clear fashion. The Estate argues that a proper special verdict form would have asked the jury to consider Officer Miller's negligence only, and in doing so permit it to also consider the justified use of force jury instructions. The trial court discussed this issue at considerable length with

20

counsel and suggested the justified use of force question first because, if Officer Miller was justified in his actions, the instructions made clear that he was immune from liability for damages. When read as a whole, and in light of the instructions pertaining to an officer's justified use of force, the Special Verdict Form accurately presented the contested issues to the jury. The trial court exercised its sound discretion when it required the jury to consider the justifiable use of force question and the negligence question individually, and in that order. Its decision was neither unreasonable nor arbitrary given the nature of the Estate's negligence claim and the asserted defense. The District Court did not abuse its discretion.

¶35    *3. Did the District Court abuse its discretion by failing to record all sidebar discussions of evidentiary objections?*

¶36    During the trial, the District Court held dozens of sidebar conferences on objections lodged by both parties. Many of these conversations were off the record, with only the District Court's ruling on the objections being recorded. The Estate argues that these sidebar conversations were so numerous as to deprive it of a fair trial and constitute fundamental, structural error, reversible if "the cumulative effect of small errors is so great as to work prejudice." Officer Miller responds that structural error review is reserved for criminal matters, has never been applied to a civil case in Montana, and has been applied in federal civil cases only in extraordinary situations. Further, he notes that on multiple days of the trial the District Court held in-chambers, on-the-record, meetings prior to trial commencing and that the parties were not prohibited from requesting additional in-chambers meetings to discuss evidentiary objections.

¶37   The doctrines of structural error and cumulative error are similar but distinct concepts. Structural error is "error that affects the framework of the trial process, rather than simply an error in the trial process itself." *State v. Forsythe*, 2017 MT 61, ¶ 40, 387 Mont. 62, 390 P.3d 931 (quoting *State v. Van Kirk*, 2001 MT 184, ¶ 38, 306 Mont. 215, 32 P.3d 735) (internal quotation marks omitted). Though typically occurring pretrial, structural error can at times occur during a trial, but whenever it occurs it is "of constitutional dimensions" or of such a magnitude as to "fundamentally undermine 'the fairness of the *entire* trial proceeding.'" *Forsythe*, ¶ 40 (quoting *Van Kirk*, ¶ 38) (emphasis original).

¶38   The cumulative error doctrine, on the other hand, concerns prejudice resulting from the cumulative effect of two or more individually harmless errors that, combined, have the same prejudicial effect as a single reversible error. *State v. Cunningham*, 2018 MT 56, ¶ 32, 390 Mont. 408, 414 P.3d 289. "The sum of these [otherwise harmless] errors can serve as a basis for reversal." *Cunningham*, ¶ 32 (citing *Kills on Top v. State*, 279 Mont. 384, 392, 928 P.2d 182, 187 (1996)). In order for cumulative errors to warrant reversal, the defendant must establish prejudice; "a mere allegation of error without proof of prejudice is inadequate to satisfy the doctrine." *Cunningham*, ¶ 32 (citing *McGarvey v. State*, 2014 MT 189, ¶ 36, 375 Mont. 495, 329 P.3d 576). The Estate identifies no civil case in which this Court has applied either structural error or cumulative error.

¶39   Even if we were to consider those theories here, the Estate could not prevail under either doctrine. Although there were numerous off-the-record sidebar conferences at trial,

the District Court, after excusing the jury at the end of the first day of trial, explained to counsel why they were necessary:

> The technology of this particular Courtroom doesn't allow me to have a record made . . . [the court reporter] can't have it come from my [microphone] into her machine unless it also come[s] from my [microphone] into those speakers. So, I shut the [microphone] off and we don't have a record . . . and I shut [it] off of course so the jury can't hear our discussion.

¶40 The District Court's rationale for holding off-the-record sidebars is supported by M. R. Evid. 103(c), which states: "[i]n jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury." Additionally, before and during the trial the District Court held numerous conferences on the record addressing evidentiary issues, where it explained its reasoning regarding its evidentiary rulings. The Estate does not point to any time during the trial when the District Court prohibited counsel from making a desired record outside the presence of the jury, and it fails to demonstrate that the District Court fundamentally undermined the fairness of the entire proceeding by its conduct of the trial. *Forsythe*, ¶ 40.

¶41 Regarding cumulative error, the Estate does not allege any particular evidentiary rulings it claims require a full transcript for this Court to properly review. In its reply brief, the Estate states only that many of its objections related to prior bad acts evidence offered against Frazier. It contends that had there been a record of every side bar conference, it *could* have had more bases to lodge an appeal. This amounts to a "mere allegation of error without proof of prejudice" and does not satisfy the cumulative error doctrine.

23

*Cunningham*, ¶ 32. The District Court did not abuse its discretion by not making a record of all side bar conferences.

## CONCLUSION

¶42 For the foregoing reasons, the judgment of the District Court is affirmed.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ JIM RICE
/S/ INGRID GUSTAFSON