FILED

03/10/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0216

DA 25-0216

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 48

IN RE THE MARRIAGE OF:

MELISSA BARTKOWSKI,
f/k/a MELISSA MURPHY,

      Petitioner and Appellant,

  and

GRAHAM MURPHY,

      Respondent and Appellee.

APPEAL FROM:   District Court of the Fifth Judicial District,
In and For the County of Madison, Cause No. DR-29-2022-1
Honorable Christopher D. Abbott, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Marybeth M. Sampsel, Measure Law, PC, Kalispell, Montana

      For Appellee:

      Margaret Sullivan Rose, Bridger Law, Bozeman, Montana

          Submitted on Briefs:  January 28, 2026

          Decided:  March 10, 2026

Filed:

               _____
                       Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     Melissa Bartkowski and Graham Murphy divorced in 2022 after approximately five years of marriage.  They agreed to a parenting plan that provided for shared parenting of their daughter, A.M.  In 2024, Melissa's daughter from a previous marriage disclosed that Graham had sexually abused her in 2019.  Melissa petitioned the court to modify the parenting plan to prohibit Graham from having unsupervised visitation with A.M.  The District Court declined to do so, concluding that Melissa failed to provide sufficient evidence for it to find a change in A.M.'s circumstances as required by § 40-4-219(1), MCA.  We address the following restated issues:

1. *Did the District Court err when it concluded that there was insufficient evidence to find that Graham posed a threat to A.M.'s safety?*

2. *Did the District Court err when it presided over the hearing via two-way audio-video communication?*

We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶2     Melissa and Graham married in October 2017 and resided in Twin Bridges, Montana.  Their daughter A.M. was born in 2018.  Both spouses had children from prior marriages: A.R.M. and E.M., Melissa's daughters; and B.M., Graham's daughter.

¶3     In January 2022, Melissa and Graham filed a joint petition for dissolution of marriage in the Fifth Judicial District Court.  The parties filed a proposed parenting plan with their petition.  They agreed that A.M. would spend Sunday through Friday afternoons with Melissa and the remainder of the week with Graham, switching to Saturday through

Thursday with Melissa once A.M. started kindergarten. They also stipulated that A.M. would rotate between them for holidays. The arrangement mirrored Graham's parenting schedule with B.M. so that the two girls could continue to spend time with one another. Graham agreed to pay Melissa $300 monthly in child support. The District Court adopted the parties' proposed parenting plan and entered its final dissolution decree in May 2022.

¶4 After the divorce, E.M. and A.R.M. disclosed that Graham had allegedly made inappropriate sexual contact while still married to Melissa. A.R.M. alleged that Graham had sexually assaulted her in summer 2019. A.R.M. was ten years old at the time. Melissa filed a separate proceeding seeking an order of protection against Graham in August 2024. After a hearing, the District Court entered an order prohibiting Graham's contact with A.R.M. for one year and with A.M. for thirty days.

¶5 In October 2024, Melissa filed an ex parte motion in the dissolution case, requesting that the court enter an emergency interim parenting plan pursuant to § 40-4-220, MCA. Melissa alleged that an immediate amendment of the plan was necessary because A.M.'s order of protection was about to expire and allowing Graham to have unsupervised contact with A.M. would pose a risk to her health and well-being. The District Court granted Melissa's motion and permitted Graham four hours of supervised visitation with A.M. every Saturday, increasing to six hours weekly after two months. The parties agreed to maintain this status until a show cause hearing, when the court would determine whether to modify the original parenting plan.

3

¶6   The show cause hearing occurred on February 11, 2025, in Virginia City, Montana. The District Judge presided over the hearing remotely from Helena. Graham and Melissa testified, as did E.M.; Cynthia Beller, the visit supervisor; Dr. Robert Page, a psychologist; Stephanie Day, Graham's girlfriend; and other acquaintances. A.R.M. did not testify because Melissa feared that A.R.M.'s appearance would be detrimental to her mental health.

¶7   In its findings of fact, conclusions of law, and order on motions, the District Court concluded that there was a change of circumstances to warrant minor amendments to the parenting plan but that Melissa failed to provide sufficient evidence for it to find that Graham had abused her daughters. The court modified the plan to change the location for child exchanges, ordered that A.M. engage in counseling with her current therapist unless the therapist determined that counseling was no longer necessary, and directed that neither party record or listen in on A.M.'s conversations with the other parent or use tracking devices without the other parent's consent. The court vacated its order adopting the interim parenting plan and reinstated the original plan that permitted Graham unsupervised parenting of A.M.

## STANDARDS OF REVIEW

¶8   When reviewing a district court's ruling on a request to amend a parenting plan, we review its findings of fact for clear error and its conclusions of law for correctness. *In re Whyte*, 2012 MT 45, ¶ 14, 364 Mont. 219, 272 P.3d 102. A finding is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the

4

evidence, or if we are firmly convinced that the court made a mistake. *In re C.J.*, 2016 MT 93, ¶ 12, 383 Mont. 197, 369 P.3d 1028. If the court's findings "upon which the decision to amend are predicated are not clearly erroneous, then we will only overturn the district court if there is a clear abuse of discretion." *In re Whyte*, ¶ 14 (citing *In re D'Alton*, 2009 MT 184, ¶ 7, 351 Mont. 51, 209 P.3d 251). A district court abuses its discretion when it "acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice." *In re C.J.*, ¶ 13 (citation omitted).

¶9　　In general, we do not review alleged procedural errors if the complaining party failed to timely object in the district court. *In re Parenting of F.L.F.L.K.*, 2025 MT 41, ¶ 15, 421 Mont. 1, 564 P.3d 844. Even if the party properly preserved the claim for appeal, we will not reverse on procedural grounds absent a showing of substantial prejudice. *In re Parenting of F.L.F.L.K.*, ¶ 15.

## DISCUSSION

¶10　　*1. Did the District Court err when it concluded that there was insufficient evidence to find that Graham posed a threat to A.M.'s safety?*

¶11　　The party seeking to amend a parenting plan under § 40-4-219, MCA, "carries a heavy burden of proof." *In re Marriage of Oehlke*, 2002 MT 79, ¶ 17, 309 Mont. 254, 46 P.3d 49 (citations omitted). The court may amend or modify a parenting plan only if it finds (1) that the child's circumstances have changed based on "facts that have arisen since the prior plan or that were unknown to the court at the time of the entry of the prior plan," and (2) that modification is necessary to serve the child's best interests. Section 40-4-219(1), MCA; *Bessette v. Bessette*, 2019 MT 35, ¶ 16, 394 Mont. 262, 434 P.3d 894.

5

A court may not modify an existing parenting arrangement without first finding changed circumstances. *In re Marriage of Oehlke*, ¶ 12 (citations omitted). When determining whether modification is necessary to serve the child's best interests, the court must consider the factors set forth in § 40-4-212, MCA, including "physical abuse or threat of physical abuse" against the child. Sections 40-4-212(1)(f), -219(1)(a), MCA.

¶12 The District Court found, "Although the Court understands Melissa's decision not to have A.R.M. testify, the absence of testimony from A.R.M. makes it very difficult for the Court to assess the veracity of the claims and gauge Graham's level of danger, if any, to A.M." The court explained that it was left to weigh the parties' competing claims and expressed hesitation about assuming that the allegations were true. Based on these findings, the court concluded:

> Melissa has not provided sufficient evidence for this Court to conclude by a preponderance of the evidence that Graham abused A.R.M. or [E.M.]. (This is <u>not</u> a finding that no such abuse occurred, merely a conclusion that there is not enough evidence for the Court to make a finding.) Accordingly, Melissa has not shown a change of circumstances on this basis.

¶13 On appeal, Melissa argues that the District Court erred when it failed to find that there was change in A.M.'s circumstances that warranted modification of the parenting plan and abused its discretion when it reinstated Graham's unsupervised parenting time. She alleges that the court failed to adequately consider the existing order of protection and other evidence that Graham posed a risk to A.M.'s safety in contravention of § 40-4-212, MCA. Graham responds that the District Court properly weighed the parties' admissible, conflicting evidence and did not abuse its discretion.

6

¶14 E.M. testified that Graham sexually abused her when she was thirteen. E.M. and Graham were taking turns playing a game on her phone when E.M. began to feel tired and laid down. Graham sat on top of E.M., began massaging her back, and eventually moved below her waist band. E.M. testified that she felt "confused, angry, [and] upset," and that she later told Graham she wanted nothing to do with him. She did not tell Melissa or any of her other family members about the incident until approximately 2024 after "[A.R.M.] started having her fits of passing out and going through these convulsions that we thought were like due to PTSD." Although E.M. admitted that she told Child Protective Services (CPS) that she didn't believe Graham would harm his own daughters, she said at the hearing that she was "terrified" that Graham would harm A.M.

¶15 Melissa said that after disclosing Graham's alleged abuse, A.R.M. began to have episodes where she passed out or became unresponsive. Melissa explained that she filed for the order of protection against Graham while he was under criminal investigation and that, although CPS and law enforcement interviewed her daughters, Graham had not faced criminal charges or arrest. Graham denied engaging in sexually inappropriate conduct with E.M. and A.R.M. He said that CPS dropped its investigation against him because it found the claims unsubstantiated. Other than this testimony, the parties did not present evidence regarding CPS or law enforcement's investigations.

¶16 Witnesses also testified that, on two occasions in 2020 and 2022, Graham drove the girls home while he was under the influence of alcohol and marijuana. Graham denied these allegations, and the court found that they were not entitled to any weight because

they were "stale" and, even if true, had nothing to do with A.M.'s current needs. Beller and Day both testified that they did not have concerns about Graham's parenting but that the inconsistent parenting structure confused A.M. and caused her to grow apart from her half-sister, B.M., because the two didn't get to spend as much time together.

¶17 District courts have "broad discretion when considering the parenting of a child, and we must presume that the court carefully considered the evidence and made the correct decision." *In re C.J.*, ¶ 13 (citations omitted). We do not ask whether the evidence could have supported a different outcome or whether this Court would have reached a different result. *In re C.J.,* ¶ 19.

¶18 There is conflicting evidence in the record regarding whether Graham abused E.M. and A.R.M. Because A.R.M. did not testify, the court had direct evidence from only E.M. and Graham. The court did not explicitly find Graham to be more credible, noting that there was little evidence to assist in assessing their competing claims. The court concluded, however, that it lacked a factual basis for finding that A.R.M.'s allegations against Graham "are more likely than not true," finding no admissible evidence in the record—other than timing—that Graham was the cause of her distressing behaviors. The court also noted the evidence that the current limitations on Graham's parenting time had been harmful to A.M.

¶19 When the evidence could support more than one conclusion, we do not second-guess the court's determinations of witness credibility or how it resolved conflicts in the evidence. *In re Marriage of Oehlke*, ¶ 21. Although the court expressed discomfort with the limited evidence in the record, it carefully considered the conflicting testimony,

8

demonstrated conscientiousness toward the parties, and thoroughly explained its reasoning. It is not the appellate court's role to substitute our own interpretations of the evidence. In light of the broad discretion afforded the District Court, we do not find clear error in its finding of insufficient evidence for it to determine that Graham posed a risk to A.M.

¶20 Melissa contends, however, that the District Court erred by failing to adequately consider the existing order of protection. The same District Judge presided over both the order of protection hearing and the parenting plan hearing. A.R.M. did not testify at either proceeding. At the parenting hearing, Melissa sought to testify regarding A.R.M.'s sexual abuse allegations toward Graham. Graham's counsel objected, arguing that evidence from the order of protection hearing was inadmissible hearsay. The court agreed, stating: "The order of protection hearing is a completely separate case with a different standard, different issues, different reasons to develop the testimony . . . . I'm not really giving a whole lot of weight to what was or was not said at that hearing." The court limited Melissa to testifying only about her observations of A.R.M. In its order, the court acknowledged that it entered an order of protection in favor of A.R.M. for one year and in favor of A.M. for thirty days.

¶21 As discussed, courts must consider evidence of physical abuse or threat of physical abuse when determining whether amendment of a parenting plan is in the child's best interests. Sections 40-4-212(1)(f), -219(1)(a), MCA. The parties did not present any admissible evidence related to the order of protection hearing. Although the court did not expressly take judicial notice, *see* M. R. Evid. 202(b)(6), (c), it acknowledged the order in its findings and conclusions. Melissa is bound by this limited record on appeal. *See* M. R.

9

App. P. 8(1). We must presume that the court carefully considered the sparse evidence regarding the sexual abuse allegations and the order of protection when it concluded that Melissa failed to meet her "heavy burden" of proving a change in A.M.'s circumstances sufficient to warrant further restrictions on Graham's parenting time. *In re C.J.*, ¶ 13; *In re Marriage of Oehlke*, ¶ 17. On the record before us, we are not convinced that the court misapprehended the effect of the order of protection or that it made a mistake. *In re C.J.*, ¶ 12.

¶22 Because the court did not commit clear error in its findings of fact, it properly declined to modify Melissa and Graham's parenting agreement for A.M.'s residential schedule under § 40-4-219(1), MCA. At least on the limited evidence in the present record to substantiate Melissa's claims that Graham posed a danger to A.M., the District Court's decision not to amend the parenting plan was not arbitrary, without employment of conscientious judgment, or beyond the bounds of reason. *In re C.J.*, ¶ 13.[1]

¶23 *2. Did the District Court err when it presided over the parenting plan hearing via two-way audio-video communication?*

¶24 The show cause hearing took place at the Madison County Courthouse in Virginia City. The parties appeared in person, but the District Judge appeared remotely from Helena using Zoom videoconferencing software. At the beginning of the hearing, the Judge said, "I have to apologize, my intention as of yesterday afternoon was to come down in person.

---

[1] As noted, the court did require counseling for A.M. in her best interests. Section 40-4-219, MCA, does not foreclose future proceedings if circumstances change. *See In re A.M.B.-B.*, 2025 MT 270, 425 Mont. 79, 579 P.3d 989.

Between a combination of dodgy roads on the Helena side of things and I'm coming down with a cold, I just didn't want to veer off the road in a Sudafed-induced haze. I apologize." Although the District Judge did not give the parties prior notice of his intention to appear remotely, neither party objected or requested a continuance.

¶25 Melissa argues on appeal that the District Court's remote appearance compromised the fairness of the hearing and prejudiced her right to a fair trial. Graham responds that Melissa failed to preserve this claim for appeal. Melissa claims that traditional preservation principles do not apply or, alternatively, that we should reverse under the plain-error doctrine because the court's remote appearance was a structural error.

¶26 We are not persuaded by Melissa's argument that she had no opportunity to preserve her claim because the District Judge gave no advance notice of his remote appearance. She did not ask to continue the hearing or register an objection on the record that has been presented to this Court.

¶27 In rare cases, we will apply the plain-error doctrine to review unpreserved claims that implicate a party's "fundamental constitutional rights and where failing to review the alleged error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *State v. Lawrence*, 2016 MT 346, ¶ 9, 386 Mont. 86, 385 P.3d 968 (citations and quotations omitted). A structural error "affects the framework within which the trial proceeds, rather than simply an error in the trial process itself." *State v. Van Kirk*, 2001 MT 184, ¶ 38, 306 Mont. 215, 32 P.3d 735 (quoting *Arizona v. Fulminante*, 499 U.S. 279,

11

310, 111 S. Ct. 1246, 1265 (1991); *State v. LaMere*, 2000 MT 45, ¶ 48, 298 Mont. 358, 2 P.3d 204). These errors typically occur pretrial and implicate a party's constitutional rights. *Estate of Frazier v. Miller*, 2021 MT 85, ¶ 37, 404 Mont. 1, 484 P.3d 912. Structural errors are presumptively prejudicial and automatically reversible. *Van Kir*k, ¶¶ 38-39.

¶28    We generally limit the structural error doctrine to criminal cases, and Melissa cites no case that supports extending it to the context here. *See Estate of Frazier*, ¶ 38. Further, Melissa has not proven that the court's remote appearance constitutes structural error. Melissa cites *Bonamarte v. Bonamarte*, 263 Mont. 170, 866 P.2d 1132 (1994), and *City of Missoula v. Duane*, 2015 MT 232, 380 Mont. 290, 355 P.3d 729, in support of her argument that the District Court's remote appearance violated Montana law and prejudiced her rights. In both cases, we analyzed whether the court abused its discretion by permitting a witness to testify remotely. *Bonamarte*, 263 Mont. at 173-74, 866 P.2d at 1134 (concluding that the court erred when it permitted a party to a marriage dissolution action to testify via telephone); *Duane*, ¶¶ 20-21 (affirming the district court's decision to permit a witness to testify via Skype). Our decisions in those cases rested on whether the witness's remote testimony deprived a party of their right to confront adverse witnesses. *Bonamarte*, 263 Mont. at 175-76, 866 P.2d at 1134-36; *Duane*, ¶¶ 20-21; M. R. Evid. 611(e) ("Except as otherwise provided . . . at the trial of an action, a witness can be heard only in the presence and subject to the examination of all the parties to the action, if they choose to attend and examine.").

¶29 Here, the parties appeared and testified in person. Four witnesses, including E.M., testified via Zoom, but the parties agreed to permit remote testimony prior to the hearing. Melissa could see, hear, and cross-examine adverse witnesses as required by M. R. Evid. 611(e). *Bonamarte* and *Duane* thus do not apply because Melissa's right to confrontation is not implicated by the court's remote appearance.

¶30 District courts have "broad discretion" to decide trial administration matters. *Estate of Frazier*, ¶ 12 (citing *Jarvenpaa v. Glacier Elec. Coop.*, 1998 MT 306, ¶ 12, 292 Mont. 118, 970 P.2d 84). The District Judge exercised this discretion when he chose to attend the hearing remotely, given weather and health concerns. Zoom's videoconferencing software allowed the Judge to observe and assess the evidence in real time. The record does not demonstrate that the court experienced technical difficulties that impaired the proceedings. Although we acknowledge that this case involved important factual determinations, the record does not support Melissa's position that the court's remote appearance undermined the fairness of the hearing and caused a manifest miscarriage of justice or compromised the integrity of the judicial process.

## CONCLUSION

¶31 We conclude that, given the limited evidence in the record and the broad discretion afforded the District Court, the court did not clearly err in finding insufficient evidence to conclude that Graham posed a risk to A.M.'s safety and did not abuse its discretion by reinstating Graham's unsupervised parenting time. The District Court did not commit plain error when it presided over the show cause hearing via Zoom's videoconferencing

software.  We therefore decline to review Melissa's unpreserved claim of error, and we affirm the District Court's order.

/S/ BETH BAKER

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON

14